IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM GILLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:14CV124-SRW |
| | ) | |
| KELLY & PICERNE, INC., | ) | |
| d/b/a ALABASTER BAY | ) | |
| APARTMENT HOMES, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED MEMORANDUM OPINION AND ORDER**

Plaintiff William Gilley ("Plaintiff") brings this action against Defendant Kelly & Picerne, Inc., d/b/a Alabaster Bay Apartment Homes ("Defendant"), alleging employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1] (Doc. #1, at 1). Plaintiff contends that he was subjected to sexual harassment, discrimination, and retaliation. (Doc. #1, at 5). He claims that "[t]he sexual harassment of the Plaintiff by his co-worker and/or supervisor was unwelcome and was severe and/or pervasive enough to adversely affect the terms and conditions of his employment." (Doc. #1, at 5, ¶ 27). Plaintiff further alleges that Defendant knew or should have known of the sexual harassment or hostile environment, but Defendant "did not take effective preventative action or prompt effective remedial action." Doc. #1, at 5, ¶ 28. Plaintiff alleges that he "was also

---

[1] Plaintiff originally claimed supplemental state law violations of negligent and/or wanting hiring, supervision, and retention. (Doc. #1, at 1). Plaintiff has since withdrawn the state law claims, (Doc. #27, at 20 n.14), and the court will not address them.

subjected to sex discrimination in his disparate treatment in the terms, benefits and conditions of his employment in that the Defendant failed to adequately address his complaints of sexual harassment and also terminated his employment and evicted him from his home." (Doc. #1, at 6, ¶ 29). He maintains that he "made good faith and reasonable complaints of sexual harassment and/or sex discrimination to the Defendant," but Defendant "retaliated against the plaintiff for protesting and complaining about sexual harassment and/or sex discrimination in the terms, conditions, and benefits of his employment, including subjecting him to unwarranted discipline and culminating in his termination and eviction from his home." (Doc. #1, at 6, ¶¶ 30 31).

This action is presently before the court on defendant's motion for summary judgment. (Doc. #22). Upon review of the motion and the record, the court concludes that summary judgment is due to be granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For summary judgment purposes, an issue of fact is "material" if, under the substantive law governing the claim, its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the movant fails to satisfy its initial burden, the motion for summary judgment will be denied. Kernel Records Oy v. Mosley, 694 F.3d 1294, 1300 (11th Cir. 2012), cert. denied, 133 S. Ct. 1810 (2013). If the

movant adequately supports its motion, the burden shifts to the opposing party to establish – "by producing affidavits or other relevant and admissible evidence beyond the pleadings" – specific facts raising a genuine issue for trial. Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1315 (11th Cir. 2011); Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010); Fed. R. Civ. P. 56(c)(1)(A). "All affidavits [and declarations] must be based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence[.]" Josendis, 662 F.3d at 1315; Fed. R. Civ. P. 56(c)(4). The court views the evidence and all reasonable factual inferences in the light most favorable to the nonmovant. Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 702 F.3d 1312, 1316 (11th Cir. 2012). However, "'[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.'" Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013)(citation omitted).

## BACKGROUND AND UNDISPUTED FACTS[2]

---

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). These are the facts for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted). Also, the "facts" set out herein are gleaned from the parties' evidentiary submissions but not from counsels' unsubstantiated statements in the parties' briefs. "Statements by counsel in briefs are not evidence." Skyline Corp. v. N.L.R.B., 613 F.2d 1328, 1337 (5th Cir. 1980). See also Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

Plaintiff began work at Defendant's property management company on October 10, 2012, as a maintenance supervisor at the Alabaster Bay apartment complex in Dothan, Alabama. (Doc. #1 at p. 2, ¶ 4; Gilley Depo. 37, 46; Doc. #28-6, at 231). One of Plaintiff's benefits was free housing, and Plaintiff lived in an apartment on site with his wife and child. Gilley Depo. 48, 50. Mike Collins was the Maintenance/Safety Director for Defendant, based out of Florida. Collins Depo. 16. Greg McGinnis was Defendant's Vice President of Property Management over Alabaster Bay. McGinnis Depo. 19.

Collins did not receive training on sexual harassment or discrimination except reading the company's employee handbook. Collins Depo. 38-39. Collins could not recall when he last took the online sexual harassment course. Collins Depo. 45-50, 90-92, 96; Doc. #28-6, at 171-73. McGinnis recalled taking a sexual harassment course at least once but did not recall other training on sexual harassment, and he did not receive training on sexual discrimination or retaliation. McGinnis Depo. 53, 56-67. McGinnis and Collins did not receive training on how to conduct a sexual harassment investigation. Collins Depo. 146-47; McGinnis Depo. 115-16.

When Plaintiff began work in October 2012, he signed an acknowledgment that he had downloaded a copy of Defendant's employee handbook. Doc. #28-5, at 43. Plaintiff signed a separate document acknowledging that he was required to read the policies and procedures manual within thirty days of his start date, and that he could ask his supervisor for a copy of the manual and ask questions he might have about it after he read it. Doc. #28-

4

5, at 48. Plaintiff did not recall going through training or orientation. Gilley Depo. 149.  The

sexual harassment policy in effect when Plaintiff began his employment was dated January

2012. It provided, in part, "Any employee who believes that he/she has been subjected to

sexual harassment shall immediately report the conduct to his or her supervisor. If the

employee's supervisor is the person allegedly engaging in the sexual harassment, the

employee should report the conduct to a higher level administrator within the Company."

Doc. #28-2, at 3. McGinnis testified that the company has an open-door policy to receive

complaints. McGinnis Depo. 210-02. The policy did not include an anti-retaliation

component. Instead, it provided that "a bad faith claim of sexual harassment [was] a major

offense. Depending on the circumstances of the incident, disciplinary action will be taken up

to and including discharge." Doc. #28-2, at 3. The policy was updated in December 2012

after Plaintiff began working at Alabaster Bay. Collins Depo. 101; McGinnis Depo. 61-62;

Doc. #28-5, at 43.

On January 30, 2013, Samantha Mejia was hired as property manager at Alabaster

Bay, but she did not live on site. Gilley Depo. 12-14. Mejia also signed an acknowledgment

that she downloaded a copy of the Defendant's employee handbook. Doc. #28-7, at 241. In

addition, Mejia signed a non-discrimination agreement, Doc. #28-7 at 242, and an

acknowledgment that she was required to read the policies and procedures manual within

thirty days of her start date, and that she could ask her supervisor for a copy of the manual

and ask questions she might have about it after she read it. Doc. #28-7, at 243.

Mejia was plaintiff's direct supervisor. Collins Depo. 22-23. According to Plaintiff's charge of discrimination, Mejia began flirting with Plaintiff and making unwanted sexual advances toward him within a week of her hire, "such as telling [Plaintiff] that her fiancé was out of town and asking [Plaintiff] to come over to her place and stay with her." Doc. #28-5, at 44. In his deposition, Plaintiff testified that Mejia asked him to come over to hang out because her fiancé was out of town. Gilley Depo. 12. Plaintiff asserted that he "repeatedly turned down her advances and explained that he was not interested," but Mejia continued her advances. Doc. #28-5, at 44. Plaintiff testified that Mejia invited Plaintiff over at least four or five times. Gilley Depo. 13. Plaintiff testified that Mejia made unwanted comments to Plaintiff when he came into work, such as telling him he "was attractive today, looked good." Gilley Depo. 13. On one occasion when Mejia invited Plaintiff over to her house one night, Plaintiff said "This isn't right; we need to – you need to stop that because I'm not going to come to your house. Let's don't make it awkward at work." Gilley Depo. 145. Mejia never explicitly asked Plaintiff for sexual relations. Plaintiff reported Mejia's comments to Plaintiff's wife. Gilley Depo. 14, 146. The first time Plaintiff's wife met Mejia, Plaintiff's wife questioned whether Mejia "had ever come on to" Plaintiff before Plaintiff ever said anything to his wife about Mejia's behavior. Gilley Depo. 146. Plaintiff's wife never suggested that Plaintiff should quit because it bothered her that Plaintiff worked with Mejia. Gilley Depo. 148.

On Monday, February 25, 2013, Mejia sent the following text messages to Plaintiff:

| 12:48 p.m. | My office door is shut but clubhouse is open with sign out front. . . The meeting is supposed to last 2 hours. |
| 12:49 p.m. | U wanna come hit pipe for 5 min? |
| 12:49 p.m. | U look Hoyt |
| 12:49 p.m. | Hott I mean |

Doc. #28-5, at 42. Plaintiff understood that Mejia was going to be in a meeting with corporate at 1 p.m. Gilley Depo. 19. Plaintiff interpreted "hit pipe" to mean Mejia was asking Plaintiff for sex, and that "pipe" referred to Plaintiff's penis. Gilley Depo. 15-16. Plaintiff found the messages to be sexually harassing because he interpreted them as asking Plaintiff to have sex with Mejia and telling him that he looked hot. Gilley Depo. 15-16, 19-20. Plaintiff's wife also interpreted them the same way Plaintiff did. Gilley Depo. 6. After receiving the text messages, Plaintiff "stayed away from" Mejia "because [he] wasn't going to put [himself] in that situation." Gilley Depo. 32.

Right after he received the texts, Plaintiff called Collins, the Maintenance/Safety Director, who was out of state, and informed him about the texts. Gilley Depo. 21, 26-28, Doc. #28-5, at 44; Collins Depo. 115. Plaintiff makes inconsistent allegations as to whether he also reported the earlier advances to Collins and McGinnis. In his Charge of Discrimination, Plaintiff states that he "immediately" reported to Collins the inappropriate text messages and behavior. Doc. #28-5, at 44. In his deposition, however, Plaintiff stated that he reported the invitations to come over the day after he reported the text messages because Plaintiff "felt like it was not going to go away." Gilley Depo. 14-15. Plaintiff testified that he discussed the earlier advances with McGinnis the next day, but Plaintiff also

testified he told McGinnis "the exact same thing [he] told to [Collins]." Gilley Depo. 29-30. McGinnis testified that Plaintiff never told him "that there was previous questions about going to her apartment and things of that nature." McGinnis Depo. 108. McGinnis's notes from the incident regarding Gilley's and Mejia's statements also do not mention Mejia's prior advances toward Plaintiff. Doc. #28-6, at 244. Construing the evidence in the light most favorable to Plaintiff, as is required at summary judgment, Plaintiff complained to Collins and McGinnis on either February 25 or 26 about Mejia's invitations to her house while her fiancé was away, as well as about the February 25 text messages.

Collins never met Plaintiff in person. Gilley Depo. 28; Collins Depo. 121. Collins testified that he was unaware of Mejia's other advances toward Plaintiff. Collins Depo. 119-20. Collins asked Plaintiff to read him the texts; after hearing them, Collins responded by telling Plaintiff to go talk with Mejia. Gilley Depo. 27; Collins Depo. 115. Collins told Plaintiff to confront Mejia because "we always encourage people to try to work things out," because Collins was many hours away, and because McGinnis, the Vice President of Property Management, was out of state. Collins Depo. 132-33. Collins's "immediate thought was it was more drug-related than a sexual innuendo." Collins Depo. 115. Collins testified that he asked Plaintiff to inquire if the texts were meant for Mejia's boyfriend or husband, but Collins also admitted that, at the time, he did not know if Mejia was even dating anyone. Collins Depo. 116. Collins admitted that the scenario of an individual questioning his boss might may have been uncomfortable for the employee, Plaintiff. Collins Depo. 134. Collins

testified that, looking back, he would not have done the same thing for a female, and he added, "I wouldn't have done the same thing for a male either... . I probably would have sent them home for the day until somebody else could have got there and mediated." Collins Depo. 145-48.

Plaintiff confronted Mejia right after she got out of the meeting, and at first Mejia said she never sent Plaintiff any texts and had no idea what Plaintiff was talking about. Gilley Depo. 21. Plaintiff testified that Mejia could tell Plaintiff was offended and "tried to cover up as much as possible." Gilley Depo. 22. Plaintiff called Collins back and said "that she blew it off and said that it was an accident," and Collins said, "[t]hat's what I figured. It's fine." Gilley Depo. 28. Plaintiff told Collins it was "not fine, because, if I was a female, this would be looked into more in depth." Gilley Depo. 28. Collins then said he would speak with McGinnis. Gilley Depo. 28. About three or four hours later, Mejia apologized to Plaintiff and said the texts were meant for her fiancé. Gilley Depo. 21.

The next day, Tuesday, February 26, 2013, Plaintiff called McGinnis. Gilley Depo. 29-30. Plaintiff told McGinnis the same thing that Plaintiff told Collins and informed McGinnis that Plaintiff talked to Collins. Gilley Depo. 30. McGinnis had not yet spoken with Collins and was unaware of the incident. He said he would look into it. Gilley Depo. 30. Plaintiff said the texts included a sexual reference, but McGinnis did not ask Plaintiff what the reference meant. McGinnis Depo. 87-88. McGinnis did not immediately report plaintiff's complaint to human resources, as company policy required him to do, and McGinnis was not

disciplined for failing to comply with the policy. McGinnis Dep. 78-79. McGinnis also did not immediately begin an investigation. McGinnis Dep. 136-37.

On Wednesday, February 27, 2013, Collins reported plaintiff's complaint to McGinnis. Collins Depo. 123. Collins told McGinnis that he was concerned the messages were drug related, if they were not sexual harassment. Collins Depo. 130-31. McGinnis never spoke with Mejia about inviting employees to her office to do drugs, and he did not report possible illegal drug use on the property. McGinnis Depo. 83, 85. McGinnis was unsure if the phrase "hit pipe for 5 minutes" referred to smoking drugs or "something else." McGinnis Depo. 87.

McGinnis was already scheduled to visit Alabaster Bay to review operations from Tuesday through Thursday. Gilley Depo. 31. During the visit, Plaintiff, McGinnis, and Mejia went over a lot of work-related issues. On the first day of McGinnis's visit, he discovered a heavily water-damaged apartment. McGinnis Depo. 99-100; Collins Depo. 63. Plaintiff and Mejia appeared surprised when they learned about the flooded apartment. McGinnis Depo. 101. According to McGinnis, neither Plaintiff nor Mejia was disciplined as a result of the apartment. McGinnis Depo. 103. The next day, on Wednesday, McGinnis walked the site with Plaintiff, and they discussed issues such as "units not being turned, the conditions of the ones that were supposedly turned ... ." McGinnis Depo. 104-05. "Being turned means getting an apartment ready for a new tenant." Collins Depo. 71. McGinnis stated that he was not disciplining Plaintiff during the discussions. McGinnis Depo. 105.

By late afternoon on Wednesday, McGinnis had not yet discussed plaintiff's complaint about sexual harassment. Gilley Depo. 31, McGinnis Depo. 104-05. McGinnis did not bring up the matter because he "thought there was a misunderstanding and it was solved." McGinnis Depo. 77, 90. McGinnis "was waiting for [Plaintiff] to come to [McGinnis]– if that's what he believed." McGinnis Depo. 91.  Aggravated, Plaintiff asked McGinnis to step out of the pool room, and Plaintiff raised the issue. Plaintiff said, again, if the gender roles were reversed, it would already have been handled, and McGinnis said they would go over the matter that day. Gilley Depo. 31-32. Plaintiff told McGinnis that Mejia sent some texts that Plaintiff believed were for him. McGinnis Depo. 105. McGinnis asked Plaintiff why he believed the texts were sexual in nature, but McGinnis could not remember what Plaintiff responded. McGinnis Depo. 108. McGinnis took no notes when he spoke with Plaintiff, but he said he would call Therese in human resources. McGinnis Depo. 108-09. McGinnis said he told Plaintiff that he and the company took the claims seriously, but McGinnis did not tell Plaintiff what, if anything, he would do about it. McGinnis Depo. 126-27.

McGinnis then called Therese in human resources, who instructed McGinnis to take statements and then bring Plaintiff and Mejia together. McGinnis Depo. 76, 108, 111. After speaking with  Therese, McGinnis did not go back to Plaintiff to get a statement, and he did not recall having Plaintiff write a statement of his complaints. McGinnis Depo. 113-15, 127-28. Instead, McGinnis spoke with Mejia, who said she intended the texts for her fiancé or boyfriend. McGinnis Depo. 117. At the deposition, McGinnis could not recall asking

Plaintiff to read or show McGinnis the texts, he was unsure if he ever saw them while Plaintiff was employed by defendant, and he admitted it may have been helpful to see the messages when he was investigating whether they were inappropriate. McGinnis Depo. 119, 121-22. McGinnis did not recall taking steps to verify Mejia's story. McGinnis Depo. 129. At his deposition, McGinnis could not recall if he believed Mejia's story when she told it, and he still does not know if he believes Mejia's story. McGinnis Depo. 137-38.

Plaintiff then was called to a meeting with McGinnis and Mejia. Gilley Depo. 33. Mejia said she intended the texts for her fiancé, and Plaintiff said he did not believe her. Gilley Depo. 33. Plaintiff showed McGinnis the messages, and according to Plaintiff, he read them. Gilley Depo. 34. McGinnis then said they both would need to take a Grace Hill course on sexual harassment, and Mejia began accusing Plaintiff of work performance issues which she had not raised before. Gilley Depo. 33-35; McGinnis Depo. 130, 145-46, 154-55. McGinnis argued that Plaintiff knew about the flooded apartment because his personal property was in it. McGinnis Depo. 144-45. McGinnis said the meeting turned into a shouting match between Plaintiff and Mejia, and he said to them, "Look, you guys continue this right here, then I have to make a decision that nobody's going to like, and I just have to let both parties go right there, because they were just–it was like under attack mode." McGinnis Depo. 118. McGinnis could not recall if he said he would make a decision they did not like or said terminate them both. McGinnis Depo. 148. Mejia took the Grace Hill training course, but Plaintiff did not. McGinnis Depo. 150-51.

McGinnis then spoke to Plaintiff by himself. McGinnis Depo. 149. McGinnis said "[a]s long as you do what you need to do, which is turn units, address the issues that we have, from a site standpoint, he had–he didn't have to worry." McGinnis Depo. 156-57. Plaintiff expressed concerns that Mejia would fire him, and McGinnis said Mejia was not in a position in which she could fire Plaintiff. McGinnis Depo. 157. As the property manager, however, Mejia's job description gave her authority to hire and terminate all employees. Doc. #28-4, at 2. McGinnis did not report plaintiff's concerns about retaliation to human resources or anyone else at the company. McGinnis Depo. 157-58.

The parties disagree on what happened the next morning. Plaintiff testified that he went to work and was changing locks when McGinnis approached him and said he thought it was time for Plaintiff to start looking for another job. Gilley Depo. 41. Plaintiff asked why. According to Plaintiff, McGinnis said he thought it was "in the best interest of everybody." Gilley Depo. 41. Plaintiff told McGinnis it was because Plaintiff reported the texts, and if the gender roles were reversed he would not be terminated, and it was "bull crap." Gilley Depo. 41. Plaintiff states that McGinnis then said Plaintiff "need[ed] to get your stuff out of here-- you need to get out and go, and you need to get your shit off of the property and move out." Gilley Depo. 41-42. Plaintiff states that he did not quit. Gilley Depo. 45-46.[3]

---

[3] According to McGinnis' own account, on that day he approached Plaintiff and asked him about capping off the leaky pipe that had flooded the apartment or calling the contractors to extract the water from the carpet in the apartment, and Plaintiff had done neither. McGinnis Depo. 158-59. McGinnis testified there were units they could not get into because they were missing keys, and Plaintiff was going to drill the locks so they could get inside. McGinnis Depo. 159. When McGinnis went over to where Plaintiff was drilling locks, McGinnis saw that Plaintiff was not wearing his

During his deposition, Plaintiff recalled no conversation with McGinnis about safety glasses on his final day of work, and Plaintiff recalled that he was wearing eyeglasses. Gilley Depo. 41-42, 62. Plaintiff states that he already had drilled the lock when McGinnis approached him, and he was not drilling. Gilley Depo. 45, 62-63. Gilley also testified that McGinnis said nothing in their final conversation about Plaintiff's failing to cap off a leak, and the only time Plaintiff was aware of a leak was during the walkthrough the previous day. Gilley Depo. 59-61.

Plaintiff and his family moved out immediately, and moved in with his parents, where he paid rent when he was able to get back on his feet. Gilley Depo. 37, 49-50, 70-71. Plaintiff's marriage suffered as a result of the stress of losing his job and his living circumstances. Gilley Depo. 70-71. In the fall of 2013, Plaintiff tried to take his own life as a result of being unable to find a job, having nowhere to live, and the stress in his marriage that ended in divorce in 2013. Gilley Depo. 72-73, 75-78, 120, 132.

Mejia no longer works for the company. She was let go in June 2013 because of

---

safety glasses. McGinnis Depo. 159-60. Plaintiff told McGinnis he could not have anything on his eyes, and McGinnis said they go over his eyes, not on them, and if a drill bit snapped off and hit him, it would be a real issue, so Plaintiff put them on, but he was unhappy about it. McGinnis Depo. 160. Less than a minute later, McGinnis looked over at Plaintiff and saw that he had slid the safety glasses to his neck but was still operating the drill bit in the doorknob. McGinnis Depo. 160. McGinnis states that he told Plaintiff, "put your glasses back up." McGinnis Depo. 160. According to McGinnis, Plaintiff then said he was giving his notice, and McGinnis said, "you don't have to work your notice. You can go. Just leave. Get the heck off the property." McGinnis Depo. 160. McGinnis recalled that Plaintiff was not wearing regular eyeglasses. McGinnis Depo. 161. McGinnis does not recall if he swore at Plaintiff. McGinnis Depo. 162. McGinnis said that he "was a little upset that he just was going to give notice because I was telling him to put his PPE [personal protective equipment] on." McGinnis Depo. 163.

14

multiple performance issues. McGinnis Depo. 138-42; Doc #28-7, at 249.

## DISCUSSION

### Analytical Framework for Discrimination Claims

Under Title VII, it is unlawful for an employer to discriminate against an employee on the basis of her race, color, religion, sex, or national origin with respect to the terms and conditions of her employment. 42 U.S.C. § 2000e–2(a)-(m). The McDonnell Douglas/Burdine[4] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination. See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997); Brown v. Alabama Department of Transportation, 597 F.3d 1160, 1174 (11th Cir. 2010). The Plaintiff must first make out a prima facie case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir. 1998); Combs, 106 F.3d at 1527-28. "'Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.'" Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 254).

If the plaintiff establishes a prima facie case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action."

---

[4]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the prima facie case is destroyed. Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528. A plaintiff may establish pretext by producing evidence that reveals "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" Springer v. Convergys Customer Management Group, Inc., 509 F.3d 1344, 1348-49 (11th Cir. 2007)(quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)). "However, a reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" Id. (citing Brooks v. County Comm'n. of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006))(emphasis in original).[5]

---

[5]In some cases, proof that an employer's asserted justification is false, when coupled with the evidence establishing the plaintiff's prima facie case, is sufficient to permit an inference of discrimination. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

### Sexual Harassment - Hostile Environment Claim

To prevail on his Title VII hostile environment claim, Plaintiff must establish:

(1) that [he] belongs to a protected group; (2) that [he] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee ... ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (alterations added); see Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1250-51 (11th Cir. 2014) ("To evaluate whether a work environment is objectively hostile, we consider four factors: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.' In the light of these factors, we ask whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive to alter the terms or conditions of the plaintiff's employment.") (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)).

Viewing the evidence in the light most favorable to Plaintiff, during the course of the nineteen days they worked together, Mejia flirted with Plaintiff, telling him that he was attractive and looked good. She asked him to visit her home because her fiancé was out of town, and she invited him over four or five times. Plaintiff took Mejia's statements to be

17

sexual propositions. One night, Mejia invited Plaintiff to her house, and he told her it was not right, she needed to stop, and she should not make things awkward at work. Gilley Depo. 145. Mejia raised the suspicions of Plaintiff's wife before Plaintiff told her of Mejia's behavior. Gilley Depo. 146. Mejia then sent Plaintiff text messages inviting him to "hit pipe for 5 min," which Plaintiff took as an invitation to sex; then Mejia immediately sent him a text that he looked "Hott." Doc. #28-5, at 42; Gilley Depo. 15-16.

After carefully considering the summary judgment record – even taking Mejia's text message, "U wanna come hit pipe for 5 min?" as an invitation to Plaintiff for sexual intercourse[6] – the court concludes that Mejia's harassment of Plaintiff was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory working environment.

Plaintiff's case is not so minimal as that on which Defendant relies, McMillian v. Donahue, 2014 WL 4071646, at * 1, *5 (S.D. Ala. July 28, 2014), where a postal employee's supervisor once approached the employee while the employee was standing in front of his service vehicle and talking to a female friend, and the supervisor asked the employee to

---

[6] The parties expend a good deal of effort attempting to define what "hit pipe" means. None of the sources that the parties cite define the exact phrase that Mejia used. Doc. #27, at 13; Doc. #23, at 8-10. The court also has not found a slang definition for "hit pipe." "Hit the pipe" suggests drug use. E.g., State v. Simon, #A09 446, 2010 WL 1967338, at *3 (Minn. Ct. App. May 18, 2010) ("hitting the pipe" means smoking methamphetamine); http://onlineslangdictionary.com/meaning-definition-of/hit-the-pipe. "Pipe" is also a slang word for penis and the act of sexual intercourse, and "hit" is slang for sexual intercourse. See http://www.urbandictionary.com/define.php?term=pipe ; http://www.urbandictionary.com/define.php?term=hit.

"'pop your trunk' while giggling, looking back and forth at Plaintiff and his female friend, and snapping his fingers repeatedly." The court ruled that the comment was an isolated incident, not sufficiently serious when considered in the context of the statement, and – regardless of the supervisor's true intent – the "behavior was neither sufficiently severe nor pervasive as to alter the terms and conditions of Plaintiff's employment nor create a discriminatorily abusive working environment." Id. (citing Bartlett v. W.T. Harvey Lumber Co., 398 F. Supp. 2d 1311, 1318 (M.D. Ga.2005)); see also Mendoza, 195 F.3d at 1249 (holding that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of [the supervisor] making a sniffing sound" over a five-month period was not frequent).

On the other hand, the harassment in Plaintiff's case is not as pervasive or severe as that on which Plaintiff relies, Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1248 (11th Cir. 2004). In Hulsey, a supervisor immediately began asking his new hire for dates, and the supervisor's harassment was "frequent, occurring at least 18 times during the approximately 2 to 2-1/2 weeks between his initial attempt to get [the plaintiff] to date him and her termination on August 16, 2001. His conduct was severe, involving many direct as well as indirect propositions for sex. It included following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants. It included enlisting the assistance of others to hold her while he attempted to grope her." Id. (alteration added). The alleged harassment in Plaintiff's case is also not as degrading as that

in <u>Terry v. Laurel Oaks Behavioral Health Ctr., Inc.</u>, 1 F. Supp.3d 1250, 1265 (M.D. Ala. 2014), where the conduct was more severe than that in Plaintiff's case. In <u>Terry</u>, the employee's supervisor "made multiple propositions for sex, wrapped his arm around [the employee's] neck in conjunction with one of those propositions, used his authority to get [the employee] alone with him at work, and directed [the employee's] attention to his noticeably erect private parts." <u>Id.</u> at 1265 (concluding that a reasonable jury could find the behavior was "physically threatening and degrading on account of [the plaintiff's] sex, particularly given that the harassment came from [the plaintiff's] direct superior") (citing <u>Hulsey</u>, 367 F.3d at 1248)).

Here, based on the record, Plaintiff allegedly received unwanted advances from Mejia some ten times during the nineteen days they worked together. Although the number of incidents is high for the length of time over which they occurred, the incidents were not severe. They included invitations to come over to Mejia's home, statements to Plaintiff that he was attractive and looked good, and the text messages discussed above. Mejia never touched Plaintiff physically or made overtly gender-related remarks. Her alleged comments to Plaintiff made him uncomfortable, and she (perhaps) invited him for sexual relations through an unclear innuendo, but she did not directly ask him for sex. Mejia's conduct caused Plaintiff "to stay[] away from" Mejia to avoid the situation, Gilley Depo. 32, and Plaintiff told Mejia he did not want things to be "awkward" at work," Gilley Depo. 145, but Plaintiff does not state how, exactly, Mejia's behavior interfered with his work performance.

Under the totality of the circumstances, Plaintiff's case is no more egregious than that in Mendoza, where the employee failed to establish sufficiently severe or pervasive harassment when a supervisor said, "I'm getting fired up," the supervisor rubbed his hip against the employee's hip while touching her shoulder and smiling, the supervisor twice made a sniffing sound while looking at the employee's groin area and once sniffed without looking at her groin, and the supervisor constantly followed and stared at the employee in a "very obvious fashion." Mendoza, 195 F.3d at 1247; see also id. at 1246 (collecting cases from other circuits). Plaintiff's alleged harassment also was not more severe or pervasive than that in Miller v. Lectra USA, Inc., 145 F. App'x 315, 317 (11th Cir. 2005). In that case, the Court of Appeals concluded the employee failed to show a prima facie case of hostile work environment where one supervisor "(1) at a hotel bar and in front of [plaintiff] and other co-workers, loosened the tie of a married, male co-worker and rubbed her hands all over his chest and head, (2) took [plaintiff] with her to purchase condoms and told [plaintiff] that the condoms were for her "love-fest weekend with [her] new boyfriend," and (3) talked about her sex life with male and female co-workers. [Plaintiff] further allege[d] that [another employee] (1) made comments to her about her being a good-looking female and her marriage not being that serious as she had been only recently married, (2) told her that she looked good in short skirts, and (3) asked her out for drinks and dinner on a number of occasions." Id. Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that Mejia's harassment of him was severe and pervasive enough to alter the

terms and conditions of his employment. Because the court concludes that Plaintiff fails to establish a prima facie case of hostile work environment sexual harassment, it does not address Defendant's <u>Faragher/Ellerth</u> affirmative defense.

## Discrimination / Desperate Treatment Claim

To establish a prima facie case of disparate treatment discrimination, Plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably than he was. <u>Maynard v. Bd. of Regents of Div. of Universities of Florida Depts. of Educ. ex rel. Univ. of South Florida</u>, 342 F.3d 1281, 1289 (11th Cir. 2003).

Even assuming that Plaintiff meets the first three elements of a prima facie disparate treatment claim, Plaintiff's claim falters on the fourth element – that is, whether similarly situated employees outside Plaintiff's class were treated more favorably. Plaintiff claims that he was subjected to disparate treatment when Defendant "failed to adequately address his complaints of sexual harassment and also terminated his employment and evicted him from his home." Doc. #1, at 6, ¶ 29. The only evidence that Plaintiff cites to show that similarly situated employees were treated more favorably is that Mejia was not fired after Mejia and Plaintiff got into a shouting match during their meeting with McGinnis. Doc. #27, at 35-36. McGinnis Depo. 118, 147-48; Gilley Depo. 34. Plaintiff does not explain why Mejia should have been fired or how her continued employment after the meeting constituted

discrimination based on sex. The gravamen of Plaintiff's disparate treatment claim is that if the gender roles were reversed, Defendant would have responded differently to his sexual harassment complaint. In his deposition, Plaintiff testified, "I feel like that's part of the reason I got fired is because I reported that, and that's almost discrimination." Gilley Depo. 11. Plaintiff stated that he told McGinnis, "if it was a female and man – or a man on a woman, it would have already been dealt with," Gilley Depo. 31, and that "[i]f this was – the role was very reversed and I was a woman reporting a man, that I wouldn't be terminated." Gilley Depo. 41. But Mejia did not complain about sexual harassment; therefore, she is not a similarly situated comparator to Plaintiff. See generally Grant v. Miami-Dade Cty. Water & Sewer Dep't, 2015 WL 7434234, at *3 (11th Cir. Nov. 23, 2015) ("The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.") (quotation marks and citation omitted). Moreover, one's supervisor cannot be a comparator as a matter of law because a supervisor and subordinate hold different jobs and, consequently, they are not "similarly situated in all respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); see also Crosby v. Computer Science Corp., 470 Fed. App'x 307, 309 (5th Cir. 2012) (a plaintiff's supervisor is not a "valid comparator").  Plaintiff presents no evidence that Defendant treated any woman who reported sexual harassment more favorably than it treated Plaintiff.

Plaintiff characterizes Collins's deposition testimony as admitting that, "had the gender roles been switched, [Collins] would not have told a female employee to confront her

male boss in such a situation." Doc. #27, at 14. Collins, however, did not say he would have treated similarly situated men and women differently. Instead, Collins testified that, looking back, "I wouldn't have done the same thing for a male either. . . . I probably would have sent them home for the day until somebody else could have got there and mediated." Collins Depo. 145-48. Thus, Collins's testimony is not direct evidence of discrimination. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012) ("Direct evidence of discrimination is evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee and that, if believed, proves the existence of a fact without inference or presumption.") (quotation marks and citation omitted). Plaintiff fails to present sufficient evidence that similarly situated female employees were treated more favorably than he was; consequently, he cannot establish a prima facie case of disparate treatment discrimination. See Maynard, 342 at 1281, 1289. Defendant is entitled to summary judgment on this claim.

## Retaliation Claims

To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) a causal relationship exists between his protected activity and the adverse action. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008); see 42 U.S.C. § 2000e-3(a) (unlawful to discriminate against employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"). If the plaintiff establishes a prima facie case giving rise to a presumption of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate reason for the materially adverse action. Brown, 597 F.3d at 1181 (quoting Bryant v. Jones, 575 F.3d 1281, 1307-08 (11th Cir. 2009)). If the defendant successfully rebuts the presumption, the plaintiff may then demonstrate that the articulated reason is a pretext to mask the defendant's improper motive. Id.

Statutorily protected activity includes formal EEOC complaints and, as in Plaintiff's case, complaints to supervisors about sexual harassment or discrimination. Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 716 n.2 (11th Cir. 2002) ("Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'") (quoting Rollins v. Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam)); see also 42 U.S.C. § 2000e-3(a) (participation clause and opposition clause). "To engage in protected activity under the opposition clause of § 2000e-3a, a plaintiff must have a good faith, objectively reasonable belief that the employer is engaging in unlawful employment practices." Harris v. Florida Agency for Health Care Admin., 611 F. App'x 949, 951 (11th Cir. 2015) (citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002)). The standard has both a subjective and objective component. Defendant

challenges only the objective reasonableness of Plaintiff's belief. Doc. #23, at 17-20. To determine whether Plaintiff's belief is objectively reasonable, the court "measure[s] the plaintiff's belief against the substantive law at the time of the offense." Id. (citing Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001). "A plaintiff's belief about an unlawful employment practice may be objectively unreasonable if the practice he complains about falls well short of the standard necessary for an adverse action." Harris, 611 F. App'x at 951(citing Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010)).

However, a retaliation claim need only be "close enough" to create an objectively reasonable belief. Clover v. Total System Servs., Inc., 176 F.3d 1346, 1352 (11th Cir. 1999). The "close enough" standard remains undefined by the Eleventh Circuit or the Supreme Court.  Further complicating the lack of a binding definition of that term of art is the fact that there is little discussion by courts on the factors that should be considered when determining what is "close enough."  One district court recently undertook to craft a rule for deciding the "close enough" issue consistently with the requirements of a retaliation claim under Title VII. See Taylor v. Cardiovascular Specialists, P.C., 4 F. Supp. 3d 1374, 1379 (N.D. Ga. 2014) ("[W]hen is the opposed conduct close enough to discrimination to support an objectively reasonable belief that it is? If the [Eleventh Circuit] has provided a simple answer, neither the magistrate judge, the parties, nor the Court has found it.") (internal citation and marks omitted).

This court is persuaded that the Taylor decision articulates the correct rule to be

applied to determine whether a plaintiff has come "close enough."

The circuit ... has made clear that when the offensive conduct cannot reasonably constitute discrimination (i.e., when it is contrary to circuit precedent or is not "anywhere near" sufficient), opposing that conduct does not constitute protected activity. Put simply, subjectively offensive conduct falls along a spectrum. At one end is conduct that is nowhere near sufficient, so no reasonable person could believe it is discrimination. At the other end is conduct that as a matter of law is discrimination, so every reasonable person would believe it is discrimination. Between these poles is conduct that a reasonable person could, but is not required to, believe is discrimination. This strongly implies that offensive conduct is "close enough" to justify a reasonable belief so long as it could (even if it likely would not) persuade a reasonable jury. This is the rule that will be applied here.

Interpreting the "close enough" standard in this way has several advantages. First, it is consistent with the oft-repeated maxim that reasonable people can disagree. Second, it recognizes that the purposes of the anti-retaliation and anti-discrimination provisions are different. As the Supreme Court has explained,

> The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.

[Burlington Northern & Santa Fe Railway Co. v.] White, 548 U.S. [53] at 63, 126 S. Ct. 2405 [(2006)] (internal citation omitted). Third, it avoids placing an onerous burden on the plaintiff's prima facie case of retaliation. See Burdine, 450 U.S. at 253, 101 S.Ct. 1089 (holding that under the McDonnell Douglas framework the "burden of establishing a prima facie case ... is not onerous"). Finally, it prevents courts from engaging in an arbitrary evaluation of the underlying claim's likelihood of success.

Thus, [a plaintiff's] formal complaint constitutes protected activity under the anti-retaliation provision only if the offensive conduct that she opposed, when viewed cumulatively and in its social context, comes anywhere near constituting sexual harassment. Accord Fine v. Ryan Int'l Airlines, 305 F.3d 746, 752 (7th Cir. 2002) ("It is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is 'completely groundless.' But a groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination." (internal citation omitted)).

Taylor, 4 F. Supp. 3d at 1379-80 (footnotes omitted).  The rule expressed in Taylor bolsters

Plaintiff's argument that, when determining whether the conduct he opposed was "close

enough" so as to be objectively reasonable, this court should also look to Little v. United

Technologies, Carrier Transicold Div., 103 F.3d 956 (11th Cir. 1997), which reads, in

pertinent part,

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case [of retaliation] and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978). See also Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), cert. denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).

Id. at 960.

In short, to show objective reasonableness, Plaintiff need meet the higher threshold

of proving, in this case, that he could sustain claims for hostile work environment or

desperate treatment.   To get "close enough" for purposes of his retaliation claims, the Plaintiff's complaints of unlawful actions by his employer need only be those that a reasonable person could find to be unlawful.[7]

### *Retaliation Based on Sexual Harassment Complaint*

Plaintiff argues that Defendant is not entitled to summary judgment on his first retaliation claim because Plaintiff objectively and reasonably believed that he was "subjected to continuous acts of sexual harassment within a very short period of time culminating in his supervisor soliciting him for sex via text message on February 23, 2013." Doc. #27, at 34. When viewing the evidence in a light most favorable to Plaintiff, his complaints to McGinnis and Collins focused on the text messages and the events leading up to the messages.  Plaintiff makes inconsistent statements as to whether he alerted McGinnis and Collins to Mejia's earlier advances, but the court is obligated to assume that he did so for two reasons.  First, to find that Plaintiff did not complain to Collins and McGinnis about all the alleged instances of sexually charged actions by Mejia would be tantamount to weighing the evidence and making a credibility determination that is adverse to Plaintiff.  There is a dispute of fact that

---

[7] A plaintiff's complaint is not objectively reasonable if, "[w]here binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1214 (11th Cir. 2008).  It is axiomatic that a holding is necessarily limited by the underlying facts of the case, and there is no binding case identified by the parties or that this court could find that fits the facts of this case and "squarely holds" that the conduct that formed the basis of Plaintiff's complaints of sexual harassment and desperate treatment are not unlawful.  Accordingly, the court will look to the factual circumstances of this case and the relevant case law to determine objective reasonableness.

must be resolved by a jury regarding the substance and timing of Plaintiff's complaints to McGinnis and Collins.  Second, regardless of whether Plaintiff complained about only the text messages or the entirety of Mejia's alleged actions, the offensive conduct must be "considered both cumulatively and in the totality of the circumstances."  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010).  Defendant's argument that the court should only consider the text messages in isolation is, therefore, rejected.

"When a person 'sexually harasses' another, i.e., makes comments or advances of an erotic or sexual nature, we infer that the harasser is making advances towards the victim because the victim is a member of the gender the harasser prefers."  Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1189 (11th Cir. 2001) (quoting Llampallas v. Mini–Circuits, Lab, Inc., 163 F.3d 1236, 1246 (11th Cir.1998)).  There is a dispute of fact as to whether Mejia's actions are "of an erotic or sexual nature." For purposes of summary judgment, the court accepts that the Plaintiff was subjected to unwanted sexual advances by Mejia, his immediate supervisor.

Plaintiff comes "close enough" to showing a hostile work environment under the Taylor rule. Here, the conduct alleged over the course of 19 days consisted of invitations to come over to Mejia's home; comments that Plaintiff looked attractive; several text messages sent within minutes, on one day, outside of the employee's presence, telling Plaintiff he looked "Hott"; and an invitation to engage in sex. But Mejia's unwanted advances of a sexual nature are not the totality of the circumstances that must be considered.  Collins testified that

he was concerned that the text messages were related to drug use if they were not sexual harassment, from which a reasonable juror could find that Collins thought the messages were an invitation by Mejia to Plaintiff to have sex. Collins and McGinnis forced Plaintiff to confront Mejia after she sent the text messages, and she denied that they were intended for Plaintiff but meant instead for her fiancé. Without conducting any investigation, Collins and McGinnis brushed aside Plaintiff's complaints of sexual harassment and accepted Mejia's explanation. McGinnis also directed Mejia and Plaintiff to take a sexual harassment training course. From those facts, Plaintiff's complaints of sexual harassment are objectively reasonable. The evidence that Plaintiff's employer's response to his complaints was to insist that he and Mejia undertake special sexual harassment training is particularly pertinent to the objective reasonableness of Plaintiff's complaints. It would be unjust and illogical to hold, where there is evidence that Plaintiff and his employer both considered that there was at least a possibility that sexual harassment occurred, that this case is not "close enough."

Also, the number of instances of alleged harassment over a 19 day period is material. "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." Reeves, 594 F.3d at 808 (emphasis in original). "Pervasive" harassment is quantified by the frequency of the conduct. See Lockett v. Choice Hotels Int'l, Inc., 315 Fed. App'x 862, 866 (11th Cir. 2009) (employee experienced harassment on a daily basis for four months); Reeves, 525 F.3d at 1139 (daily harassment for almost three years); cf. Robinson v. U.A.B., No. 2:10–CV02692–AKK, 2012 WL 4725958, at *4 (N.D. Ala. Sept. 27, 2012) (four incidents

over a three month period was not frequent); White v. Potter, No. 1:06–CV–1759, 2007 WL 1330378 (N.D. Ga. Apr. 30, 2007) (plaintiff's allegations of three specific incidents and that his co-workers called him gay and harassed him for eleven months did "not provide the Court with any basis to quantify whether the conduct was frequent").  As discussed above, there were approximately 10 separate instances of sexual advances over the course of 19 days.  While not severe in nature, the number of advances made by Mejia in a relatively short period of time is "close enough" to be objectively considered by Plaintiff to be pervasive, even if those instances do not meet the threshold necessary for Plaintiff to maintain a hostile work environment claim.

There is evidence, if credited by a trier of fact, from which a reasonable person could find that Plaintiff's job performance was negatively impacted because of Mejia's advances.  Plaintiff avoided Mejia because of the advances, and one cannot reasonably be expected to perform his job duties if he cannot interact with his supervisor due to concern that he will be exposed to unwanted sexual attention.  The numerous confrontations and meetings that Plaintiff engaged in because of Mejia's unwanted advances could be found by a trier of fact to have interfered with his job performance.

There is also evidence from which a reasonable juror could conclude that Mejia's sexual advances were humiliating to Plaintiff.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)(a court can consider whether the conduct was "humiliating" when assessing a hostile work environment claim).  In addition, there is

evidence that Mejia's advances caused Plaintiff "psychological harm," another relevant factor for a hostile work environment claim.[8] Id.

Viewing the totality of the circumstances, it is "close enough" for a "reasonable jury" to be able to conclude that Plaintiff's complaints about sexual harassment were objectively reasonable. Taylor, supra. Thus, summary judgment is due to be denied as to Plaintiff's retaliation claim based on his complaints of sexual harassment.

### *Retaliation Based on Gender Roles Complaint*

Plaintiff also claims that he was subject to retaliation based on his complaint to Defendant that, if the gender roles had been reversed, Plaintiff would have been treated differently. Defendant moves for summary judgment on "all" of Plaintiff's claims, but Defendant makes no specific argument for summary judgment on this claim, perhaps because Defendant appears to believe that "the only conduct [Plaintiff] complained about to [Defendant] were the text messages sent to him by Ms. Mejia." Doc. #23, at 20. However, Plaintiff clearly has raised a retaliation claim with regard to evidence that he complained to McGinnis that if the gender roles were reversed, Plaintiff would have been treated differently. Doc. #1 at 6, ¶ 31; Gilley Depo. 31, 41. The factual basis of that claim is asserted in Plaintiff's EEOC charge; thus, Plaintiff exhausted his administrative remedies prior to bringing the claim. Doc. #28-5, pp. 44-45. Plaintiff pointed out in his response that

---

[8] For example, Plaintiff attempted suicide after Defendant terminated his employment.  It is Plaintiff's burden to prove to a jury that any psychological injury was caused by Mejia's sexual advances.

Defendant failed to address the retaliation claim based on this comment. Doc. #27, at 35. Despite Plaintiff's observation, Defendant again made no specific argument about this claim in its reply, instead focusing on the argument that Plaintiff did not have an objectively reasonably belief that Plaintiff had opposed sexual *harassment.* Doc. #29, at 11. Because Defendant presented no argument in favor of summary judgment on Plaintiff's claim of retaliation based on this complaint, the request for summary judgment will be denied as to this claim. Cf. Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted).

In the alternative, the claim is due to proceed on its merits. Plaintiff engaged in statutorily protected activity by complaining of disparate treatment. He has shown that he subjectively believed he was being subjected to unlawful discrimination.  As to the objective reasonableness of that belief, while Plaintiff's disparate treatment claim fails as a matter of law because he does not identify a valid comparator and there is no direct evidence, the circumstantial evidence of record is such that a juror could find that Plaintiff's complaints of sexual harassment by Mejia would have been handled differently had he been a woman are "close enough." While Collins' testimony regarding how, with the benefit of hindsight, he would have responded to Plaintiff's complaints versus a complaint by a woman is not

direct evidence of disparate treatment, it is circumstantial evidence from which a reasonable juror might find that Plaintiff's employer reacted differently to sexual harassment complaints depending on the gender of the complainant.  Also, while insufficient to sustain a disparate treatment claim, McGinnis' actions of terminating Plaintiff's employment almost immediately following Plaintiff's complaints of gender bias are relevant to whether the complaint is objectively reasonable.

The causal connection element of a prima facie case for retaliation is established through the exceptionally close temporal proximity of Plaintiff's complaints and his termination. Close temporal proximity between protected activity and an adverse employment action may be sufficient to show that the two were not wholly unrelated.  See, e.g., Wascura v. City of South Miami, 257 F.3d 1238, 1244-45 (11th Cir. 2001); Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (observing that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection").  The temporal gap between events must be "very close." Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) (citations omitted). Plaintiff complained twice to McGinnis about gender disparity with regard to sexual harassment complaints – on the day prior to and on the day of his termination. That nexus is sufficient to demonstrate causation and a prima facie case. Moreover, the close temporal proximity establishes pretext. Thus, summary judgment is due

to be denied as to Plaintiff's retaliation claim based on his complaint to Defendant that, if the gender roles had been reversed, Plaintiff would have been treated differently.

## CONCLUSION

For the foregoing reasons, it is ORDERED that:

(1)     Upon consideration, the Memorandum Opinion and Order (Doc. #31) entered on January 29, 2016 is VACATED;

(2)     Defendant's motion for summary judgment (Doc. #22) is GRANTED as to Plaintiff's sexual harassment and sexual discrimination claims, and summary judgment is hereby entered in Defendant's favor as to Plaintiff's claims of sexual harassment and sexual discrimination;

(3)     Defendant's motion for summary judgment (Doc. #22) is DENIED as to Plaintiff's  claim of retaliation based on his complaints of sexual harassment and his claim that women in his circumstances would have been treated differently.

DONE, this 29th day of February, 2016.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE